2022 IL App (2d) 210527-U
No. 2-21-0527
Order filed November 29, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| MOLLY LEVY, | ) | of Lake County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 18-D-1518 |
| | ) | |
| JOSH LEVY, | ) | Honorable |
| | ) | Stephen M. DeRue, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court properly denied respondent's section 2-1401 petition seeking relief from a default judgment dissolving the parties' marriage. First, respondent did not establish that his mental health issues or any misconduct by petitioner were a basis for relaxing section 2-1401's due diligence requirement. Second, the default judgment's terms on property division, maintenance, and child support were not substantively unconscionable given the evidence of respondent's income when the judgment was entered.

¶ 2    Respondent, Josh Levy, appeals from an order of the circuit court of Lake County denying

his petition under section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West

2020)) seeking relief from a default judgment dissolving his marriage to petitioner, Molly Levy. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4      Petitioner filed a petition for dissolution of marriage on September 13, 2018. The petition was properly served on respondent, but he failed to answer or appear. On November 9, 2018, petitioner moved for entry of a default judgment. On November 27, 2018, the trial court granted the motion and entered a default judgment dissolving the parties' marriage. The judgment included the following pertinent findings: (1) the parties had two children: 10-year-old J.O.L and 7-year-old J.U.L.; (2) petitioner was unemployed; (3) respondent was employed as a real estate broker by an entity known as Levy Archer, LLC; and (4) according to the parties' income tax returns, respondent's gross income was $112,397 in 2015, $194,138 in 2016, and $872,328 in 2017.

¶ 5      The judgment awarded petitioner (1) "the sole decision making authority and responsibility for the parties' minor children," (2) exclusive possession of the former marital home (which was a rental property) and "100% of the furniture furnishings and personal property contained therein pursuant to 750 ILCS 5/503 [(West 2018)]," and (3) "100% of the parties' retirement and non-retirement accounts and investments, whether held jointly or in the name of either party pursuant to 750 ILCS 5/503 [(West 2018)]." In addition, the judgment (1) provided, "If any additional assets are located belonging to the parties' [*sic*] which existed as of the date of the Judgment of Dissolution of Marriage, they are awarded to [petitioner]"; and (2) awarded petitioner monthly maintenance of approximately $22,000, representing 30% of respondent's last known annual income, and $5000 in monthly child support.

¶ 6      On February 5, 2020, petitioner filed a petition, seeking, *inter alia*, to relocate the parties' minor children to Arizona. The trial court granted the petition on December 21, 2020.

¶ 7    On April 6, 2020, respondent filed his section 2-1401 petition to vacate the default judgment. As subsequently amended, the petition alleged that respondent suffered from mental illness characterized by delusions. Further, petitioner was aware of respondent's mental illness but withheld that information from the court when she secured the default judgment. The amended petition also maintained that the default judgment's property distribution, maintenance, and child support terms were unconscionable.

¶ 8    On February 17, 2021, petitioner filed a "Petition to Enforce Default Judgment for Dissolution of Marriage; For Return of Children's Funds, and For Other Relief" (petition to enforce). The petition alleged, *inter alia*, that respondent "was the owner of a personal custodial account *** holding slightly in excess of $100,000, for the benefit of [one of the parties' minor children]." (We note that it is undisputed that the account was a college savings plan established pursuant to section 529 of the Internal Revenue Code (26 U.S.C. § 529 (2011)), and we hereafter refer to it as "the section 529 plan.") Petitioner alleged that in 2019 and 2020, respondent "systematically withdrew all of the aforesaid funds from said personal custodial account totaling $102,483.51 ***." Petitioner sought entry of a judgment in that amount against respondent and in favor of the minor child (or petitioner as custodian of the minor child).

¶ 9    The court heard respondent's amended petition to vacate the default judgment on April 14, 2021. Petitioner testified as an adverse witness that on September 14, 2018, the parties entered into a written agreement providing that if three certain events were to occur, respondent would have the right of first refusal to have the children in his care during school vacations and certain holidays. If the events did not occur, respondent would pay the rent necessary to permit petitioner to reside in the marital home until J.U.L. completed fifth grade. The events were: (1) respondent would prove that model and actress Elizabeth Hurley was his girlfriend, (2) respondent would

appear on the cover of at least four nationally distributed magazines, and (3) respondent would "establish that he is 'Famous and Well Known in Hollywood.' " Petitioner testified that she encouraged respondent to retain a lawyer. Respondent replied that he was waiting for the band "Phish" to obtain a lawyer for him.

¶ 10 During this period, (1) petitioner had access to respondent's business bank account statements on his iPad, (2) respondent had about $500,000 in his business accounts, and (3) respondent and Brett Katz were "partners" in Waukegan Lake, LLC,[1] which was engaged in a project to develop a Chik-fil-A restaurant. Respondent and Katz said the project would make one to two million dollars. However, in July or August of 2019, petitioner learned that the Chik-fil-A project had fallen through.

¶ 11 Respondent testified that he did not earn regular income in December 2018. His 2018 tax return reflected a negative income of $246,626, which included a loss of $231,113 from Waukegan Lake, LLC. Respondent also reported $5285 of income from Western Adams Holdings, LLC, and a $10,960 loss from 4406 Pulaski Holdings, LLC. Each of those businesses was established for the development and sale of a Wendy's restaurant in Chicago. Waukegan Lake, LLC, and Western Adams Holdings, LLC, engaged various law firms in connection with the Chik-fil-A and Wendy's development projects.

¶ 12 Respondent's 2019 tax return showed that he earned $58,862 as a real estate broker. However, he reported a negative adjusted gross income of $232,231, reflecting, among other things, significant business losses carried forward. Respondent testified that he earned nothing in

---

[1]Throughout the report of proceedings, the business is also variously referred to as "Waukegan Lake Cook, LLC" or "Waukegan Lake Cook Holdings, LLC."

2020.  In 2021, he was employed by First American Properties, a business owned by his uncle. His job entailed finding sites for retail development.  He did not know how much he had earned that year.  At the time of the hearing, there was no money in the business account associated with Waukegan Lake, LLC.  Respondent testified that in 2019 or 2020, he withdrew amounts totaling more than $100,000 from the section 529 plan.

¶ 13    On August 16, 2021, the trial court denied respondent's section 2-1401 petition and granted petitioner's petition to enforce.  The court entered judgment for petitioner for $102,488, representing the amount respondent withdrew from the section 529 plan.  In denying the section 2-1401 petition, the trial court found that the terms of the default judgment of dissolution were not unconscionable.  Respondent filed his notice of appeal on September 9, 2021.  Jurisdiction is proper under Illinois Supreme Court Rule 304(b)(3) (eff. Mar. 8, 2016).

¶ 14                                II. ANALYSIS

¶ 15    A party seeking relief under section 2-1401 from a default judgment ordinarily must establish: (1) the existence of a meritorious defense, (2) due diligence in presenting the defense, and (3) diligence in filing the section 2-1401 petition.  *Warren County Soil and Water Conservation Dist. v. Walters*, 2015 IL 117783, ¶ 51.  "Due diligence requires the section 2-1401 petitioner to have a reasonable excuse for failing to act within the appropriate time."  *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 222 (1986).  However, "where justice and good conscience may require it a default judgment may be vacated even though the requirement of due diligence has not been satisfied."  *Id.* at 225.  For instance, "the due diligence requirement may be waived if the result is unfair, unjust or unconscionable" (*In re Marriage of Halas*, 173 Ill. App. 3d 218, 224 (1988)) or "when it is clear from all the circumstances that a party has procured an unconscionable advantage through the extraordinary use of court processes or where some fraud or fundamental

unfairness has been shown" (internal quotation marks omitted) (*In re Marriage of Harnack*, 2014 IL App (1st) 121424, ¶ 60).

¶ 16    Respondent contends on appeal that the default judgment awarding 100% of the marital property to petitioner and ordering him to pay $27,000 monthly in maintenance and child support is unconscionable.  He emphasizes his mental health issues, which were known to petitioner and gave rise to various delusions, such as that a well-known musical group would secure representation for him.  He claims that these issues constituted a reasonable excuse for his failure to appear in the original action.  Respondent, however, did not present any testimony from a mental health expert.  Moreover, he cites no authority that his mental health issues warrant relaxing section 2-1401's due diligence requirements.  "Arguments without citation of authority are forfeited." *Porter v. Cub Cadet LLC*, 2020 IL App (2d) 190823, ¶ 9; Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 17    Respondent also urges us to consider that petitioner secured an extremely favorable default judgment while failing to inform the trial court of respondent's mental health issues.  However, absent authority that respondent's mental health issues would excuse his failure to answer petitioner's petition or appear in the dissolution proceedings, we are unwilling to hold that petitioner's failure to disclose this matter is a sufficient equitable ground for relief under section 2-1401.  That said, we note that petitioner's testimony that she encouraged respondent to secure legal representation suggests that she did not seek to take unfair advantage of his mental health issues.

¶ 18    Respondent also cites *People v. Richardson*, 237 Ill. App. 3d 1067, 1080 (1992), which observed:

> "An unconscionable bargain has been defined as one 'which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would

accept, on the other.' [Citation.] In determining whether the parties' relative economic positions are unconscionable, courts employ commercial concepts of unconscionability: an absence of a meaningful choice on the part of one of the parties combined with terms unreasonably favorable to the other party. [Citations.] Unconscionable terms are also defined as improvident, totally one-sided and oppressive. [Citations.]"

Here, however, unlike in *Richardson* (which involved the validity of a postnuptial agreement), there was no bargain between the parties, so the applicability of these principles is debatable. In any event, the facts in *Richardson* are markedly different from the facts of this case. *In Richardson*, when the wife entered into the postnuptial agreement, she "labored under an extraordinary amount of duress" (*id.* at 1082). Among other things, the husband disingenuously assured the wife, in effect, that the agreement would save their marriage. The husband also attempted to substitute an attorney with little experience in matrimonial law for the wife's prior attorney. The *Richardson* court found "deplorable" the husband's attempts to arrange an attorney for the wife. *Id.* In addition, the husband misrepresented the value of certain assets. Thus, respondent's reliance on *Richardson* is misplaced.

¶ 19 We have concluded that the default judgment was not secured through misconduct on petitioner's part. Next, we consider whether the default judgment was substantively unconscionable, *i.e.*, "totally one sided" (see *In re Marriage of Arjmand*, 2013 IL App (2d) 120639, ¶ 30). Section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(d) (West 2018)) provides, "In a proceeding for dissolution of marriage *** the court shall assign each spouse's non-marital property to that spouse. It also shall divide the marital property without regard to marital misconduct in just proportions considering all relevant

factors[.]" Section 503(d) sets forth a non-exclusive list of 12 factors relevant to the division of marital property. *Id.* § 503(d).

¶ 20 In arguing that the judgment was unconscionable, respondent insists that "it is simply not possible to have a Judgment more one-sided than the one in this case." Respondent complains that the judgment awarded all the parties' marital and nonmarital property to petitioner. According to respondent, "[t]he Judgment awarded [petitioner] literally 100% of all assets, known or later discovered."[2] However, in denying respondent's section 2-1401 petition, the trial court remarked that petitioner was awarded 100% of "what appeared to be *** very little or close to nothing. The court noted that "no property of note has been identified by [respondent] who carries the burden under [section] 2-1401 in showing [the] judgment [of dissolution] is unconscionable."

¶ 21 The court reasoned:

"Here awarding [petitioner]100 percent of the marital property with all the facts before the Court, could be found[,] based off of facts before the Court, the awarding of property in just proportions. [Petitioner] was a stay-at-home wife caring for the children,

---

[2]That statement suggests that the trial court awarded all of respondent's nonmarital property to petitioner. We do not read the judgment that way. The judgment provided that petitioner was awarded furniture, furnishings, personal property, accounts, and investments "*pursuant to 750 ILCS 5/503.*" (Emphasis added.) Section 503(d) of the Act provides that *marital property* will be distributed in just proportions and each spouse's nonmarital property will be assigned to that spouse. 750 ILCS 5/503(d) (West 2018). We read the judgment as providing for the distribution of property in accordance with these principles.

no employment, no income. [Respondent] was the wage earner who has [*sic*] *and still has* the higher income earning potential as clearly displayed on his past earnings.

Arguably, the only tangible financial account which has been identified in this matter is the personal custodial account for the parties *** which previously held in excess of $100,000 for the benefit of the parties' minor child. This account is subject to separate litigation based upon [respondent's] alleged withdrawals subsequent to the dissolution and liquidation of said account." (Emphasis added.)

¶ 22    Respondent disputes the trial court's finding that petitioner was awarded 100 % of "what appeared to be *** very little or close to nothing." He contends that "[a]t the time the Judgment was entered, *** assets [awarded to petitioner] included [the section 529 plan] with a balance of $100,000, [respondent's] business accounts with balances of approximately $500,000, and all the parties' personal property."

¶ 23    Respondent's assertion that his "business accounts" were awarded to petitioner is incorrect. Respondent testified that he had only one business account used to operate Waukegan Lake, LLC. That business was established to undertake an ultimately unsuccessful project to develop a Chik-fil-A restaurant. The funds in the account were used for earnest money, and architectural, engineering, and legal fees. There is no evidence that the account was respondent's property as opposed to the property of Waukegan Lake, LLC. Illinois law clearly states that membership in a limited liability company does not confer any ownership interest in the LLC's property, real or personal. *Peabody-Waterside Development, LLC v. Islands of Waterside, LLC*, 2013 IL App (5th) 120490, ¶ 9. Thus, we cannot read the judgment of dissolution as awarding petitioner any interest in the business account. Furthermore, the record does not appear to support respondent's claim that *at the time of judgment*, the business account held approximately $500,000. The page of the

record respondent cites for that proposition merely indicates that petitioner was aware that respondent had business accounts with about $500,000, *at the time the dissolution proceedings were pending*.[3] Respondent points to no evidence showing how much remained in the account when the court entered its judgment of dissolution.

¶ 24 The trial court's treatment of the section 529 plan is more problematic. The court stated, "The Court cannot find that this account, which is solely for the benefit of the minor child of the parties affects this Cort's [*sic*] analysis in any way." Although the account may be for the benefit of the minor child, the account is not necessarily the child's property. The record does not reveal whether Illinois or another state sponsored the section 529 plan. For illustration, we note that Illinois sponsors a section 529 education savings program that operates under regulations that clearly distinguish between account owners and designated beneficiaries. See 23 Ill. Adm. Code § 2500.20 (eff. Feb. 8, 2022). The account owner is "[a]ny person or entity who has opened an account or to whom ownership of an account has been transferred, as allowed by the Code, and who has authority to withdraw funds, direct withdrawal of funds, change the designated beneficiary, or otherwise exercise control over an account." *Id.* A designated beneficiary is "[a]ny individual designated as the beneficiary of an account *** by an account owner." *Id.* Funds

---

[3]Respondent also cites an exhibit as evidence that the account contained approximately $460,000 at the time of judgment. The exhibit in question is a custody evaluation report, which states that petitioner shared with the evaluator "copies of [respondent's business] bank account in September 2018, which showed an available balance of $459,677." However, the default judgment was not entered until November 27, 2018.

invested in a section 529 account may be withdrawn and used for noneducational purposes, but doing so will result in adverse tax consequences:

> "If you use 529 account withdrawals for qualified higher education expenses or tuition for elementary or secondary schools, earnings in the 529 account are not subject to federal income tax and, in many cases, state income tax. However, if 529 account withdrawals are not used for qualified higher education expenses or tuition for elementary or secondary schools, they will be subject to state and federal income taxes and an additional 10% federal tax penalty on earnings." U.S. Securities and Exchange Commission, *Investor Bulletin: An Introduction to 529 Plans* (May 29, 2018) (Available at https//www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-11 (last visited Oct. 27, 2022) [https://perma.cc/6622-PE5B].

¶ 25    On the other hand, it appears that custodial funds can be invested in a section 529 plan under the Illinois Uniform Transfers to Minors Act (760 ILCS 20/1 *et seq.* (West 2020)). See generally, "The Investment of Custodial Funds in Section 529 Qualified Tuition Programs: Tax Advantages and Fiduciary Concerns," David M. Pfefferkorn, 30 Estate Planning 571, 575 (2003). In that case, the funds might be considered property of the minor, rather than marital or nonmarital property of the parties. *Id.* at 575-76 ("The transfer of custodial funds to a 529 account that names the minor as the designated beneficiary should not be considered a further gift *because the minor already owns the custodial property*." (Emphasis added)) We note that petitioner's petition to enforce characterized the section 529 account as a custodial account. However, no evidence was presented supporting that characterization. It is thus unclear whether the funds in the section 529 plan should be considered property of the minor child or marital property subject to distribution under section 503 of the Act.

¶ 26    That said, the question before us is not simply whether the trial court *erred* in the disposition of marital property, but whether its judgment was unconscionable. We cannot say that, given the pertinent considerations, including, (1) "the relevant economic circumstances of each spouse" (750 ILCS 5/503(d)(5) (West 2018)), (2) the "station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties (*id.* § 503(d)(8)), and (3) "the reasonable opportunity of each spouse for future acquisition of capital assets and income" (*id.* § 503(d)(11)). Despite considerable business reversals, respondent was apparently still able to earn income as a real estate developer and he was employed at the time of the denial of his section 2-1401 petition. Petitioner, in contrast, was a stay-at-home parent without employment or a source of income.

¶ 27    Respondent also complains about the monthly amounts of maintenance (approximately $22,000) and child support ($5000) that the default judgment of dissolution awarded. The trial court awarded maintenance equal to 30% of respondent's income in 2018. Respondent argues that, at the prove-up hearing on petitioner's motion for a default judgment, the trial court was not made aware of the fluctuations in respondent's income. However, the default judgment specifically recited his income for 2015 through 2018. We note that it is a matter within the trial court's discretion whether to award maintenance based on the obligor's average income or income for a single year. See *In re Marriage of Evanoff*, 2016 IL App. (1st) 150017, ¶ 27 ("It is within the sound discretion of the [trial] court to determine whether income averaging is necessary and such a decision will not be disturbed absent an abuse of that discretion.") Moreover, at the time, respondent was engaged in a business project to develop a Chik-fil-A restaurant. Respondent, expected the project to make one to two million dollars. Given the facts that the court knew when it entered the default judgment, we cannot say petitioner's maintenance amount was

unconscionable. Although the project fell through, respondent was not without remedy—he could have moved to modify maintenance based on a substantial change of circumstances. See 750 ILCS 5/510(a-5)(7) (West 2018).

¶ 28 The same reasoning applies to respondent's child support obligation. The trial court was not obligated to base child support on respondent's three-year average income rather than his most recent known income. Moreover, as with maintenance, respondent could have moved to reduce child support based on his decreased income. See 750 ILCS 5/510(a)(2)(A) (West 2018).

¶ 29 Accordingly, we cannot say the trial court erred in denying respondent's section 2-1401 petition.

¶ 30                                 III. CONCLUSION

¶ 31 For the preceding reasons, we affirm the judgment of the circuit court of Lake County.

¶ 32 Affirmed.